of said court should be, and the same hereby is, affirmed.

*Judgment affirmed.*

SHERICK, P. J., concurs.

MONTGOMERY, J., not participating.

CITY OF CINCINNATI *v.* METZE, ADMR.

(Decided June 1, 1931.)

*Mr. John D. Ellis,* city solicitor, and *Mr. Jacob Hauptman,* for plaintiff in error.

*Mr. John A. Scanlon* and *Mr. Thomas F. Scanlon,* for defendant in error.

Ross, P. J. This cause comes into this court on error from the court of common pleas of Hamilton county, Ohio, wherein judgment was rendered, upon a general verdict, in favor of Richard G. Metze, administrator, plaintiff below.

The amended petition charged that the city of Cincinnati was responsible for the death of plaintiff's decedent because it failed to maintain guard rails upon the approach of a bridge over which it had control, over which approach plaintiff's decedent drove his automobile, and that the city was guilty of negligence in failing to keep the roadway open, in repair, and free from nuisance.

The answer of the city of Cincinnati denies that the decedent's death was due to its neglect, and alleges that such death was caused by decedent's sole and contributory negligence.

The evidence shows that the decedent, Martin M. Metze, on the 27th day of December, 1927, was driving an open Chevrolet automobile eastwardly on Tennessee avenue in the city of Cincinnati; that his

brother, William H. Metze, the only witness of the accident, was with him in the automobile; that they had left their home on Greenlee avenue, in a suburb to the west, about 6:30 a. m., and were driving toward Norwood to the east, and the morning was dark and very foggy. The brother, who was a witness, stated that they could not see more than ten feet ahead of them. He stated that it was as bad a fog as he had ever seen out that way; and the amended petition alleges that it was "very foggy." As they proceeded along Tennessee avenue they caught up with a team of mules proceeding in the same direction. The decedent swerved the car to the left, or north, side of the road, exclaiming as he did so, "Gee, almost hit those mules," and almost immediately thereafter drove the automobile over an abutment some twelve feet high, supporting the west approach to the bridge. The injuries resulting from this accident caused the death of Martin Metze for which Richard G. Metze, his administrator, sues.

The approach to the bridge was not protected by guard rails or any other device to give warning of danger and prevent such an occurrence as the accident in the instant case. We are, however, concerned only with the absence of such warning signal or protection on the approach to the bridge, from which and not toward which traffic would normally proceed, and upon the side of this approach over which the automobile was driven. The trusses of the bridge were painted with diagonal black and white marks. There is evidence that the decedent observed the mules when eighteen feet away from them.

It was conceded by the city that the bridge was

under its control, and that there were no guard rails upon the approach on the morning of the accident. The road is much wider than the bridge, there being evidence that the bridge was only sixteen feet in width and the road more than thirty-five.

The decedent and his brother had lived in the vicinity of the bridge for some considerable time, and had for a month before the accident traveled this road, which the decedent's brother testified was known to be dangerous. It is obvious from the evidence that the decedent had had frequent opportunities to observe the condition of the bridge, and its approaches, and must have observed its unprotected character.

The brother testified:

"Q. Now before or after the accident did you know there was a bridge there at that point on Tennessee avenue? A. I knew there was a bridge there, yes.

"Q. You knew approximately where that bridge was, didn't you? A. Yes."

The brother, however, insisted, "I couldn't say I knew there was guard rails;" but he stated that he and his brother "knew the road." He also testified that they were proceeding at a rate of about eight miles per hour when the accident happened.

The evidence requires one of two conclusions: Either the decedent saw or could have seen the unprotected top of the abutment and the opening in the bridge, and, without exercising the care which an ordinarily prudent person would exercise, drove over the top of the abutment; or, he could not see by reason of the fog and dark, and driving on the wrong or-left side of the road proceeded at the rate

of eight miles an hour around the mules and over the abutment.

The decedent when he came up upon the mules, according to the evidence, had his car under control and could have followed behind the mules. He chose to pass them, as he had a right to do, providing he could do so with safety to himself and others. He knew the road, knew it was a dangerous road, knew that on it were bridges with unprotected approaches, knew that he could only see a few feet in front of his vehicle, and yet in spite of all this he persisted in forging ahead into the darkness, manifestly not knowing where he was going, and was precipitated over an abutment upon a side of the road where it could not be presumed that traffic would approach.

While it has been held that one has a right to believe that those responsible for a highway will not obstruct it, and that he may proceed in the dark, yet such rule does not justify one in ignoring conditions of the highway which are commonly prevalent and with which he is familiar.

While not completely identical in principle, there are many cases decided by the Supreme Court holding that one who proceeds in the dark, when he cannot see, cannot complain of resulting injury to himself. *McKinley* v. *Niederst*, 118 Ohio St., 334, 338, 160 N. E., 850. Paraphrasing the language of the opinion in the *Niederst case:* He had lived in the vicinity of this road for many months and had used it daily for a month, and not only knew there was a bridge on this road but knew that it had unprotected abutments. There had been no change in the location or condition and no failure to keep the road or

bridge in repair. He went forward in the darkness and heavy fog with full knowledge of the existence and general location of the bridge and its abutments and approaches. Neither the bridge nor the highway were unsafe or unnecessary institutions. They were only dangerous in that they must be utilized cautiously.

To the same general effect is the case of *E. Kahn's Sons Co.* v. *Ellswick,* 122 Ohio St., 576, 172 N. E., 668, in which this court was reversed in holding one not guilty of contributory negligence when going forward in the darkness.

It is the contention of the city that no duty rested upon it to maintain guard rails along the approach to the bridge.

General Code, Section 7563 (89 Ohio Laws, 358), as in force and effect at the time of the accident, provided as follows: "The board of county commissioners shall erect or cause to be erected and maintained where not already done, one or more guard rails on each end of a county bridge, viaduct or culvert more than five feet high. They shall also erect or cause to be erected, where not already done one or more guard rails on each side of every approach to a county bridge, viaduct or culvert if the approach or embankment is more than six feet high. They shall also protect, by suitable guard rails, all perpendicular wash banks more than eight feet in height, where such banks have an immediate connection with a public highway, or are adjacent thereto, in an unprotected condition, but in such cities and villages as by law receive part of the bridge fund levied therein, such guard rails shall be erected by the municipality."

**116**

Section 2421, General Code (Section 860, Revised Statutes), in force in 1927, provided as follows: "The commissioners shall construct and keep in repair necessary bridges over streams and public canals on state and county roads, free turnpikes, improved roads, abandoned turnpikes and plank roads in common public use, except only such bridges as are wholly in cities and villages having by law the right to demand, and do demand and receive part of the bridge fund levied upon property therein. If they do not demand and receive a portion of the bridge tax, the commissioners shall construct and keep in repair all bridges in such cities and villages. The granting of the demand, made by any city or village for its portion of the bridge tax, shall be optional with the board of commissioners."

Section 2421-1, General Code, provided as follows: "When the council of any city having a population not exceeding fifteen thousand or of a village shall cause to be filed in the office of the county auditor of the county in which such corporation is situated in whole or in part a certified copy of a resolution of such council demanding some portion of the county bridge fund levied upon property within such corporation, the county commissioners of such county may, by resolution, authorize the county auditor to draw his warrant upon the county treasurer in favor of such corporation for not to exceed sixty per cent. of the county bridge fund then levied or collected, or in process of collection, upon the property in such corporation. Such fund so received by such corporation shall be used by it for the construction, repair and maintenance of any bridges and viaducts within such corporation."

While it is conceded by the city that it maintained control over the bridge in question, there appears nothing in the record which would make the quoted statutory requirement as to municipalities apply and require as a matter of law that the city of Cincinnati was bound to erect guard rails along the approaches. The statute makes such duty dependent upon an actual sharing in the bridge fund, not control or maintenance of the bridge.

The question then presented is whether the city in the control of this bridge was bound to reasonably anticipate in the exercise of ordinary care that any one would attempt to use the extreme northern side of the approach to the bridge from the west, and that he would do so under such conditions as to prevent him from seeing where he was going. We are unable to see in what respect the city was negligent.

It is also claimed that the city permitted the existence of a nuisance, contrary to the provisions of Section 3714 of the General Code, which is, and was at the time of the accident, as follows: "Municipal corporations shall have special power to regulate the use of the streets, to be exercised in the manner provided by law. The council shall have the care, supervision and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts, within the corporation, and shall cause them to be kept open, in repair, and free from nuisance."

There is nothing in the record to show that the city had failed to keep either the bridge or the approach free from nuisance. A reading of the amended petition requires great liberality of construction to permit any allegation that the city had

maintained a nuisance either in the road or bridge. Even giving the pleading full effect there is a complete failure to show by the evidence the existence of a nuisance.

The court permitted the introduction of photographs taken long after the accident, showing that the city had thereafter erected guard rails. In view of the fact that the jury was permitted to view the premises, and the photographs showed nothing more than the jury saw in its view, we cannot see where plaintiff in error was prejudiced by the introduction of the photographs, especially as the court charged the jury that they were not to be considered as any admission on the part of the city of liability.

An examination of the record causes us to conclude that the plaintiff below failed to show any negligence on the part of the city which was the proximate cause of the injuries causing decedent's death, and that the evidence of the plaintiff below raised a presumption of contributory negligence on the part of the decedent, which was not met and equaled by any evidence to the contrary.

The motion of the plaintiff in error at the close of the case of the plaintiff below for an instructed verdict should have been granted, as should the motion at the close of all the evidence.

Thus viewing the case, the judgment of the court of common pleas of Hamilton county will be reversed, and judgment will be entered here in favor of the plaintiff in error.

*Judgment reversed and judgment for plaintiff in error.*

HAMILTON and CUSHING, JJ., concur.